Milliken & Company vs. Duro Textiles, LLC, & others.[1]

Bristol. March 3, 2008. - May 30, 2008.

Present: Greaney, Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Corporation,* Dissolution, Corporate successor liability. *Consumer Protection Act,* Unfair or deceptive act, Trade or commerce, Businessman's claim.

In a civil action to recover a trade debt owed to the plaintiff, an unsecured creditor that supplied raw materials used in the manufacturing of textiles to a textile producing and distributing corporation that sold its assets, excluding real estate, at foreclosure to a new entity (a reconstituted version of the original corporation that assumed essentially the same operations), the judge properly imposed successor liability on the new entity, where, even though the original corporation did not legally dissolve as a corporate entity, but rather changed its name, leased its real estate to the new entity, and recovered tax refunds, it fundamentally no longer existed, and the new entity, which had purchased the original corporation's operating assets, maintained the same production capabilities and sold the same goods without any interruption to the business [555-559]; where, with respect to the equitable nature of the plaintiff's claim, the plaintiff was harmed by the sale of the original corporation's assets at foreclosure, in that the plaintiff lost the opportunity to see if the original corporation's financial condition improved over time to the point where it would be able to repay its debt obligation [559-561]; and where the possibility of the new entity's dissolution at some point in the future did not foreclose the plaintiff's successor liability claim to recover at least a portion of the money the plaintiff was owed [561-562].

In an action for, inter alia, unfair or deceptive trade practices under G. L. c. 93A, §§ 2 and 11, the judge properly granted summary judgment to the defendants on that claim, where the parties were not engaged in "trade or commerce" with each other such that the acts or practices complained of occurred in a "business context," in that the only dealings among the parties occurred during discussions about restructuring the debt owed to the plaintiff during the course of a nonoperational corporation's unsuccessful bankruptcy proceedings, and during the instant litigation. [562-565]

Civil action commenced in the Superior Court Department on November 14, 2002.

[1]Duro Industries, Inc.; Patriarch Partners, LLC; Lynn Tilton; Ark Investment Partners II, LP; Ark CLO2000-1, Limited; Larry Himes; David L. Canedo; Stanley Frieze; John F. Megrue; Edward F. Ricci; and Anthony L. Sarno.

Motions for summary judgment were heard by *E. Susan Garsh*, J., and the case was also heard by her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Jeffrey J. Upton* for plaintiff.

*Hillary Richard*, of New York (*Ian Crawford* with her) for Duro Textiles, LLC, & others.

SPINA, J. On November 14, 2002, Milliken & Company (Milliken) filed an action in the Superior Court to recover a $8,754,680.11 trade debt owed by Duro Industries, Inc. (Old Duro). Milliken sought recovery from Duro Textiles, LLC (New Duro), as the corporate successor of Old Duro.[2] The essence of Milliken's first amended complaint for damages and declaratory relief (complaint) was that Patriarch Partners, LLC (Patriarch), and related entities, orchestrated a scheme to acquire the assets of Old Duro, while shedding Old Duro's debts to unsecured creditors, including Milliken. In Count I of its complaint, Milliken asserted a successor liability claim for breach of contract against New Duro, under theories of "de facto merger" or "mere continuation" of the same business, and in Count VII of its complaint, Milliken sought, inter alia, a declaratory judgment that New Duro was liable for the debts and obligations of Old Duro. As also is pertinent here, in Count VI of its complaint, Milliken asserted that New Duro; Patriarch; Ark CLO2001-1, Limited; Ark Investment Partners II, LP; and Lynn Tilton (collectively, the defendants) engaged in unfair or deceptive trade practices in violation of G. L. c. 93A, §§ 2 and 11.[3]

The parties filed cross motions for summary judgment on

---

[2]Our reference to these entities as "Old Duro" and "New Duro" is not a conclusion as to their corporate relationship with one another, but merely a simple way to distinguish them in the evolution of their existence.

[3]On June 17, 2003, a judge in the Superior Court allowed Milliken's motion for summary judgment as to Count VIII of its complaint, requesting domestication of a foreign judgment. A separate and final judgment entered pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974), in which Old Duro was ordered to pay Milliken $8,754,680.11, plus prejudgment interest and costs. On October 18, 2004, a second judge in the Superior Court allowed Milliken's motion to approve a stipulation of dismissal, with prejudice, of Counts II and III of the complaint, brought against the individual directors and officers of Old Duro, alleging breach of fiduciary duties and negligence. On February 11, 2005, the parties entered into a stipulation of partial dismissal,

Counts I and VII of the complaint, and the defendants also filed a motion for summary judgment on Count VI. Following a hearing, a judge in the Superior Court allowed, in part, Milliken's motion for summary judgment on Count I to the extent that its claim was predicated on a determination that, under either the "de facto merger" or "mere continuation" theory of successor liability, Old Duro became New Duro for purposes of its corporate debt. The judge otherwise denied Milliken's motion for summary judgment on Count I, concluding that a trial was necessary on the issue whether Milliken was an "innocent creditor," entitled to equitable relief. The judge denied the defendants' cross motion for summary judgment on Count I, concluding that they had not shown a lack of harm to Milliken such as would preclude recovery under any theory of successor liability. The judge allowed the defendants' motion for summary judgment on Count VI and dismissed Milliken's claim pursuant to G. L. c. 93A. Finally, the judge denied the parties' cross motions for summary judgment on Count VII with respect to a declaration of successor liability insofar as a trial was necessary on the "innocent creditor" issue. Following a bench trial, the judge found that Milliken was an innocent creditor, one which had not acted with "unclean hands," and, therefore, was entitled to collect its debt from New Duro pursuant to the equitable doctrine of successor liability. A final judgment entered on Count I of the complaint ordering New Duro to pay Milliken $8,754,680.11, plus interest and costs,[4] and on Count VII of the complaint declaring that New Duro was liable to Milliken for the debt of Old Duro under theories of successor liability.[5]

New Duro appealed from the judgments in favor of Milliken on Counts I and VII of its complaint, pertaining to successor liability, and Milliken cross-appealed from the dismissal, on

---

with prejudice, of Counts IV and V of the complaint, asserting claims against various defendants for aiding and abetting the breach of fiduciary duties and for civil conspiracy.

[4]In response to a motion from New Duro, the judge subsequently entered an amended judgment on Count I of the complaint ordering New Duro to pay Milliken $8,754,680.11, plus interest and costs, minus a $600,000 settlement.

[5]In the final judgment, the judge also declared that there was no basis for piercing the corporate veil of New Duro to hold Patriarch; Ark CLO2001-1, Limited; or Ark Investment Partners II, LP, liable to Milliken.

summary judgment, of Count VI of its complaint, pertaining to the defendants' alleged violation of G. L. c. 93A.[6] We transferred the case from the Appeals Court on our own motion. New Duro now contends that (1) the requirements of the "de facto merger" or "mere continuation" theories of successor liability were not met where Old Duro remains a corporation in good standing and the owner of substantial assets in the form of real estate and the right to collect tax refunds; (2) the judge erred in imposing successor liability on New Duro where Milliken failed to demonstrate that it suffered any actual harm as a result of a foreclosure sale of Old Duro's assets; and (3) the judge erred in imposing successor liability on New Duro where such action risks the dissolution of New Duro with no offsetting benefit to Milliken. In contrast, Milliken asserts that (1) the judge erred in dismissing its claim under G. L. c. 93A because a declaratory judgment of successor liability can form the basis for a c. 93A violation; (2) the judge erred in dismissing its claim under c. 93A on the grounds that Milliken did not have a commercial relationship with the defendants and could not establish that it had suffered a loss of money or property within the meaning of the statute; and (3) the judge erred in concluding that a judgment concerning successor liability was independent of c. 93A, and was not predicated on a finding of unfair or deceptive acts or practices. For the reasons that follow, we now affirm the thorough and well-reasoned decisions of the judge below.

1. *Background.* Old Duro, a Massachusetts corporation, was one of the largest independent dyers, printers, finishers, and distributors of textile products in the United States and was headquartered in Fall River. Milliken, a Delaware corporation, was one of Old Duro's primary suppliers of greige goods, the raw materials used to make textiles. In 1997, investors purchased

---

[6]"The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law." *Cargill, Inc.* v. *Beaver Coal & Oil Co.*, 424 Mass. 356, 358 (1997). See Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue. See *Pederson* v. *Time, Inc.*, 404 Mass. 14, 17 (1989). Any doubts as to the existence of a genuine issue of material fact are to be resolved against the party moving for summary judgment. See *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 371, cert. denied, 459 U.S. 970 (1982).

a majority interest in Old Duro in a leveraged buyout. A consortium of banks, led by Bank of America as agent (the bank group), helped to finance the purchase with loans and revolving credit commitments, as set forth in a credit agreement with Old Duro dated October 31, 1997. These commitments were secured by liens on Old Duro's real property and by security interests in its personal property. Bank of America filed financing statements pursuant to the Uniform Commercial Code, evidencing the bank group's security interests in Old Duro's personal property, and it recorded mortgages on Old Duro's real property.

Beginning in 1999, Old Duro began to experience financial problems due to a downturn in the textile industry and due to its debt structure resulting from the leveraged buyout. By March, 2000, Milliken was aware that Old Duro was behind in its payments, suffering substantial losses, missing its financial projections, defaulting on its loan commitments to secured lenders, and operating with its revolving line of credit suspended. Milliken decided at this time not to increase its exposure to Old Duro above $2.5 million, but it eventually did agree to extend Old Duro's credit terms from thirty to sixty days. In December, 2000, Old Duro underwent a capital restructuring, entering into, among other agreements, an amended and restated credit agreement with the bank group that reduced its total bank debt from $85 million to approximately $46 million. As a result of this restructuring, the bank group acquired 51% of the equity in Old Duro, while other entities held the remaining 49%.

Patriarch, a Delaware limited liability company, was established in 2000 by Lynn Tilton who is its principal and manager. Patriarch acts as the collateral manager or investment advisor for funds with portfolios of distressed secured debt. Its business model is to restructure or reorganize the companies in its portfolios to allow borrowers the time, liquidity, and strategic support to turn around their operations. Ark CLO2001-1, Limited (Ark I), is one of the investment funds created by Tilton for which Patriarch serves as collateral manager.[7] On December 28, 2000, Ark I purchased from one member of the bank group its 29% interest in the bank group's secured debt of Old Duro.

---

[7] As collateral manager for Ark I, Patriarch makes decisions regarding the fund's investments, including decisions relating to the financial restructuring of a borrower or the ultimate recovery on a loan.

By the spring of 2001, Milliken was working on "Project Conceal," its effort to develop a camouflage-dyed nylon product to compete with Old Duro's product for the United States military. Around the same time, Milliken learned that the Balson Hercules apparel lining division of The Balson Hercules Group, Ltd. (Balson), Milliken's largest customer for greige goods, was for sale. Milliken was concerned that if Balson did not survive, it would hurt Milliken's business, so Milliken helped to finance Old Duro's acquisition of Balson by providing it with a $2 million unsecured note. By October, 2001, Old Duro owed Milliken almost $10 million in unsecured trade debt. As of March, 2002, Milliken was "treading water" on its debt from Old Duro, receiving payments that were not sufficient to reduce receivables or to reduce their further aging. By May, 2002, Old Duro was operating at a loss, was in default under its credit agreement, and owed the bank group $41.7 million. At this time, Patriarch prepared and submitted a report to the bank group that valued Old Duro's assets at $16 million, based either on an orderly liquidation of the corporation or on an asset-based refinancing.

Ark Investment Partners II, LP (AIP), is a private equity fund created by Tilton to purchase additional lender interests in borrowers that are in other Patriarch-managed funds. AIP is an equity investor in Ark I. In May, 2002, Larry Himes, the president and chief executive officer of Old Duro, met with Tilton in an effort to persuade Patriarch to rescue the company. AIP offered to purchase the bank group's remaining 71% interest in Old Duro's secured debt for approximately $11.3 million. After receiving a separate purchase proposal from Old Duro, contingent on an asset-based financing arrangement, the bank group rejected both offers and directed Old Duro's management to begin liquidation. Old Duro retained bankruptcy counsel, and Patriarch offered to provide debtor-in-possession financing and exit financing on emergence in the event that Old Duro wanted to put together a bankruptcy plan. Around the same time, Tilton told Himes that Patriarch had no interest in liquidating Old Duro and that, if Patriarch could purchase the bank group's remaining 71% interest, she hoped to obtain a consensual restructuring of the company. Himes proposed that Old Duro pay down $2 million of its outstanding secured debt, and the bank group agreed to sell its

interest in the remaining secured debt to AIP, based on an agreement to distribute the $2 million to the members of the bank group other than Ark I.

By July, 2002, Old Duro owed Milliken approximately $8,580,565 for raw materials. Milliken's credit manager knew that if Old Duro were liquidated or declared bankruptcy, then its unsecured creditors, including Milliken, would recover nothing. Nonetheless, Milliken continued to accept and fill orders from Old Duro. On July 15, 2002, AIP paid approximately $11.4 million to purchase the bank group's remaining 71% interest in Old Duro's secured debt and equity. After Old Duro paid $2 million to the members of the bank group other than Ark I, it still owed approximately $38.6 million on its outstanding loans and revolving credit commitments. Following this buyout, Ark I and AIP (the Ark lenders) collectively held a first priority, perfected security interest in all of Old Duro's assets, and owned 51% of its stock. Around this same time, efforts by Old Duro and Milliken to renegotiate the terms of Old Duro's indebtedness so that the company could remain operational were wholly unsuccessful, and Milliken wrote off $2.5 million of Old Duro's debt as uncollectible. On August 7, 2002, Milliken's vice-president wrote to Himes demanding full payment of Old Duro's outstanding balance within five days.

On August 23, 2002, Milliken filed an action in the Supreme Court of the State of New York, New York County, to collect its unsecured trade debt, plus interest and costs, from Old Duro.[8] That same day, with the strategic support of Patriarch, Old Duro's board of directors voted to file a petition in the United States Bankruptcy Court for the District of Massachusetts for protection under Chapter 11 of the Bankruptcy Code. Its purpose was to effectuate a sale of Old Duro as a going concern under § 363 of the Bankruptcy Code, 11 U.S.C. § 363 (2000), within ninety days after the bankruptcy filing.[9] Milliken, which chaired

[8]Both Milliken and Old Duro maintained an office and place of business in New York.

[9]Under Chapter 11 of the Bankruptcy Code, once certain conditions are satisfied, the court is authorized to sell a debtor's assets free and clear of liens and of any other "interest" in the debtor's property, see 11 U.S.C. § 363(f) (2000), arguably including successor liability claims by unsecured creditors. See *Ed Peters Jewelry Co.* v. *C & J Jewelry Co.*, 124 F.3d 252, 267 n.15 (1st Cir. 1997).

the unsecured creditors' committee, strongly objected to a proposed agreement among Old Duro, the Ark lenders, and Old Duro's unsecured creditors that would have paid such creditors $1 million, plus 20% of any proceeds from the bankruptcy sale of Old Duro's assets in excess of $32 million. On September 26, 2002, Old Duro's bankruptcy petition was dismissed by the consent of the parties due to insufficient marketing efforts by Old Duro that gave the appearance of guaranteeing a sale of the company to the Ark lenders. Milliken immediately wrote off 80% of Old Duro's debt as uncollectible, and over subsequent fiscal periods, it wrote off the remainder of the debt.

On September 29, 2002, just a few days after the bankruptcy petition was dismissed, the Ark lenders scheduled a foreclosure sale in accordance with the Massachusetts Uniform Commercial Code, G. L. c. 106, § 9-601 (*f*), to allow for the sale of Old Duro's assets, with the hope that the company could continue normal operations without interruption. On September 30, 2002, the Ark lenders formed New Duro, a Delaware limited liability company created for the purpose of bidding on Old Duro's assets and capitalized with $2,000. It did not have any other cash or liquid assets. The manager of New Duro was Duro Textiles Management, Inc., a wholly-owned subsidiary of the Ark lenders. New Duro's limited liability company agreement, dated October 15, 2002, was signed by Tilton as collateral manager of Patriarch on behalf of Ark I, Tilton as president of AIP, and Tilton as president of Duro Textiles Management, Inc.

Marketing efforts for the foreclosure sale were somewhat limited, ostensibly to preserve Old Duro's customer base, and on October 18, 2002, Old Duro's assets, excluding real estate, were sold to New Duro, the only bidder, for $26.2 million.[10] The Ark lenders funded New Duro's purchase of Old Duro's assets through loans and a revolving credit commitment, and they used the $26.2 million from the foreclosure sale, less expenses, to reduce

---

[10]In the opinion of a financial expert hired by Patriarch, the fair market value of Old Duro's assets as of October 18, 2002, was less than $17.6 million. Milliken neither obtained a valuation of Old Duro's assets on this date, nor did it know what a commercially reasonable sale of Old Duro's assets, more extensively marketed, would have yielded, or whether that amount would have exceeded the claims of the secured creditors.

Old Duro's secured debt to them, which then exceeded $41 million. On the same day as the foreclosure sale, Patriarch Partners Agency Services, LLC, on behalf of the Ark lenders, recorded with the Delaware Secretary of State an all-asset security interest in New Duro's assets.

Old Duro filed an amendment to its articles of organization changing its name to "Chace Street, Inc." (Chace Street), and it leased to New Duro all of its real estate and improvements in Fall River, including Old Duro's principal place of business.[11] Chace Street has no offices or employees. At its 2002 annual meeting, Old Duro's chairman of the board of directors stated that Old Duro intended to deed its real estate to New Duro within ninety days.[12] The president and chief executive officer of Old Duro, Larry Himes, became the president and chief executive officer of New Duro. New Duro's operations are essentially the same as those of Old Duro. It has the same process capability, it continues to sell the same product lines, it originally employed all of Old Duro's employees, it honored all of Old Duro's existing collective bargaining agreements and certain of its customer contracts, it assumed some of Old Duro's equipment leases, it paid off several of Old Duro's existing debts, and it uses Old Duro's telephone number.

On November 13, 2002, the Supreme Court of the State of New York, New York County, entered a judgment in favor of Milliken against Old Duro in the amount of $8,754,680.11.[13] Milliken then commenced the present action.

2. *Successor liability.* (a) *Dissolution of corporate entity.* New Duro first contends that the judge erred in imposing on it successor liability where Old Duro remains a Massachusetts corporation in good standing and in possession of substantial

[11]Old Duro receives $50,000 per month in rent from New Duro, which it uses to reduce its remaining debt to the Ark lenders.

[12]As of June, 2005, this real estate transaction had not occurred. Chace Street remains in good standing as a Massachusetts corporation, and it continues to own real property and to recover tax refunds, assets that are encumbered by liens in favor of the Ark lenders. After the foreclosure sale, the Ark lenders retained the deficiency from the foreclosure sale on their books, secured by the preexisting mortgage they held on Old Duro's real estate.

[13]This is the foreign judgment that Milliken sought to have domesticated in Count VIII of its complaint. See note 3, *supra.*

assets.[14] New Duro points out that Old Duro never sold or otherwise transferred its real property, and Old Duro receives $50,000 per month in rental payments from New Duro for the use of such property, which was valued at approximately $6 million. A mere "cessation of ordinary business operations" does not, in New Duro's view, equate with dissolution. Therefore, on this basis, New Duro argues that it should not be deemed the successor of Old Duro. We disagree.

When analyzing a claim for successor liability under theories of "de facto merger" or "mere continuation" of the predecessor, our focus is on whether one company has become another for the purpose of eliminating its corporate debt.[15] "Most jurisdictions, including Massachusetts, follow the traditional corporate law principle that the liabilities of a selling predecessor corporation are not imposed upon the successor corporation which purchases its assets, unless (1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor." *Guzman* v. *MRM/Elgin*, 409 Mass. 563, 566 (1991). See *McCarthy* v. *Litton Indus., Inc.*, 410 Mass. 15, 21 (1991). See also *Dayton* v. *Peck, Stow & Wilcox Co. (Pexto)*, 739 F.2d 690, 692 (1st Cir. 1984) (construing Massachusetts law). The public policy underlying the imposition of successor liability is the fair remuneration of innocent corporate creditors. See *Cargill, Inc.* v. *Beaver Coal & Oil Co.*, 424 Mass. 356, 362 (1997).

---

[14]New Duro has not challenged the motion judge's extensive findings with respect to the other factors that courts generally consider under the "de facto merger" or "mere continuation" theories of successor liability. In addition, New Duro has not challenged the trial judge's finding that Milliken was an "innocent creditor."

[15]The terms "de facto merger" and "mere continuation" are often used by courts interchangeably. See *National Gypsum Co.* v. *Continental Brands Corp.*, 895 F. Supp. 328, 336 (D. Mass. 1995) ("While these two labels have been enshrined separately in the canonical list of exceptions to the general rule of no successor liability, they appear, in practice[,] to refer to the same concept"); *In re Acushnet River & New Bedford Harbor Proceedings*, 712 F. Supp. 1010, 1019 n.15 (D. Mass. 1989) (distinction between "de facto merger" and "mere continuation" seems more apparent than real). Cf. *Scott* v. *NG US 1, Inc.*, 67 Mass. App. Ct. 474, 486 n.8 (2006), *S.C.*, 450 Mass. 760 (2008) (discussing two doctrines as one).

The "de facto merger" theory of successor liability "has usually been applied to situations in which the ownership, assets and management of one corporation are combined with those of another, preexisting entity." *National Gypsum Co.* v. *Continental Brands Corp.*, 895 F. Supp. 328, 336 (D. Mass. 1995). "The factors that courts generally consider in determining whether to characterize an asset sale as a de facto merger are whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." *Cargill, Inc.* v. *Beaver Coal & Oil Co.*, *supra* at 359-360. See 15 W.M. Fletcher, Cyclopedia of Corporations § 7124.20, at 294-295 (rev. perm. ed. 2008) (discussing elements of "de facto merger"). We have stated that "[n]o single factor is necessary or sufficient to establish a de facto merger." *Cargill, Inc.* v. *Beaver Coal & Oil Co.*, *supra* at 360.

The "mere continuation" theory of successor liability "envisions a reorganization transforming a single company from one corporate entity into another." *McCarthy* v. *Litton Indus., Inc.*, *supra* at 21-22. See *National Gypsum Co.* v. *Continental Brands Corp.*, *supra* (seller establishes buyer for purpose of continuing business under new form). See also 15 W.M. Fletcher, *supra* at § 7124.10, at 282-283 (discussing elements of "continuation of business" theory). "[T]he indices of a 'continuation' are, at a minimum: continuity of directors, officers, and stockholders; and the continued existence of only one corporation after the sale of assets." *McCarthy* v. *Litton Indus., Inc.*, *supra* at 23. In essence, the purchasing corporation "is merely a 'new hat' for the seller." *Id.* at 22, quoting *Bud Antle, Inc.* v. *Eastern Foods, Inc.*, 758

F.2d 1451, 1458 (11th Cir. 1985). "[T]he imposition of liability on the purchaser is justified on the theory that, in substance if not in form, the purchasing corporation is the same company as the selling corporation." *McCarthy* v. *Litton Indus., Inc., supra.* See 15 W.M. Fletcher, *supra* at § 7124.10, at 287 ("The 'mere continuation' of business exception reinforces the policy of protecting rights of a creditor by allowing a creditor to recover from the successor corporation whenever the successor is substantially the same as the predecessor"). Similar to the considerations underlying a finding of a "de facto merger," the factors characterizing a continuing corporation are traditional indicators, but no single factor is dispositive, and the facts of each case must be examined independently. See 15 W.M. Fletcher, *supra* at § 7124.10, at 283-287.

When considering New Duro's contention that the imposition of successor liability is inappropriate here because the corporate dissolution of Old Duro never occurred, we are mindful that no single indicator of succession is controlling. In *Cargill, Inc.* v. *Beaver Coal & Oil Co., supra* at 361, this court opined that the mere fact that a corporate entity has not been formally dissolved does not preclude a finding of a de facto merger. Rather, the principles of successor liability will be imposed where a corporation ceases all of its ordinary business operations, which are assumed by another corporation, and liquidates its assets. See *id.* When this occurs, the predecessor corporation, for all practical purposes, has ceased to exist. See *id.* In a legally related but factually distinguishable vein, we stated in *McCarthy* v. *Litton Indus., Inc., supra* at 22, that the purchaser of a corporation's assets "would not be considered to be the alter ego of the seller where the seller continues to exist after the transfer of its assets." See *Roy* v. *Bolens Corp.*, 629 F. Supp. 1070, 1072 (D. Mass. 1986) (continued partial existence of manufacturing company, ostensibly capable of satisfying products liability judgment, precluded imposition of successor liability on purchaser of remainder of manufacturing company). In *McCarthy* v. *Litton Indus., Inc., supra* at 22-23, where one corporation transferred a portion of its operations to a second corporation, we concluded that the second corporation was not a "continuation" of the first because the original corporation survived the sale of a portion of its assets and

continued to manufacture its own products. Thus, a determination whether a predecessor corporation continues to exist for purposes of successor liability is wholly fact specific.

Here, it was undisputed that Old Duro ceased its ordinary business operations following the foreclosure sale, it currently has no offices or employees, and the former chief executive officer of Old Duro is now the chief executive officer of New Duro. Fundamentally, Old Duro, as a dyer, printer, finisher, and distributor of textile products, no longer exists. It sold its operating assets to New Duro, thereby enabling New Duro to maintain the same production capabilities and sell the same goods without any interruption to the business. We recognize that Old Duro did not legally dissolve as a corporate entity. Instead, it changed its name and now rents to New Duro the real estate that it still owns in Fall River and recovers tax refunds.[16] Notwithstanding this particular fact, only one among several for consideration, we decline to elevate form over substance by concluding that the nature of Old Duro's corporate existence as Chace Street trumps the existence of New Duro as the successor corporation on whom liability properly should be imposed. The existence of Chace Street simply does not undermine the nonexistence of Old Duro as a going concern.

(b) *Harm resulting from foreclosure sale.* New Duro argues that the judge below erred in imposing on it successor liability because Milliken was not actually harmed by the sale of Old Duro's assets at the foreclosure sale. New Duro points out that harm is a requirement of any equitable claim, and that the Ark lenders, as secured creditors, possessed a contractual right to foreclose on Old Duro's assets when it defaulted on its loan agreements. As such, New Duro continues, the judge incorrectly concluded that Milliken, an unsecured creditor, was harmed by losing the opportunity to wait and see if Old Duro's financial condition improved over time. We disagree.

The doctrine of successor liability is equitable in both origin

---

[16]The Ark lenders, who formed New Duro in the first instance, are the mortgagees holding legal title to Old Duro's real estate, securing the underlying debt owed by Old Duro. Given that Old Duro effectively has ceased operations and that its debt obligations far exceed the value of its real estate, Old Duro essentially remains an empty shell of a corporation with no equity.

and nature. See *Ed Peters Jewelry Co.* v. *C & J Jewelry Co.*, 215 F.3d 182, 186 (1st Cir. 2000); *In re Acushnet River & New Bedford Harbor Proceedings*, 712 F. Supp. 1010, 1015 (D. Mass. 1989). "Equitable remedies are flexible tools to be applied with the focus on fairness and justice." *Demoulas* v. *Demoulas*, 428 Mass. 555, 580 (1998). Under principles of equity, a court will consider a transaction according to its real nature, looking through its form to its substance and intent. See *Henry F. Mitchell Co.* v. *Fitzgerald*, 353 Mass. 318, 321 (1967); *Greco* v. *Hubbard*, 252 Mass. 37, 43 (1925). That is the essence of the imposition of principles of successor liability.

We agree with New Duro that the Ark lenders, as secured creditors, possessed a contractual right to foreclose on Old Duro's assets in October, 2002, after Old Duro had defaulted on its loan agreements. See G. L. c. 106, § 9-601 (*a*) (1), as appearing in St. 2001, c. 26, § 39 (after default, secured party may reduce claim to judgment or foreclose by any available judicial procedure). As such, Old Duro could have sold its assets to a third party, and to the extent that the proceeds from the foreclosure sale were insufficient to satisfy Old Duro's obligations to the Ark lenders, Milliken, as an unsecured creditor, would not have been able to recover its outstanding trade debt because, generally speaking, the liabilities of a predecessor corporation are not imposed on the successor corporation that purchases its assets. See *Guzman* v. *MRM/Elgin*, 409 Mass. 563, 566 (1991). However, that is not what occurred here. Rather, at the October, 2002, foreclosure sale, Old Duro sold all of its assets (excluding its real estate) to a reconstituted version of itself, New Duro, in an effort to maintain its textile business as a going concern with the potential for future profits, while shedding its debt obligations to unsecured creditors. Consequently, Milliken was harmed by the sale of Old Duro's assets to New Duro at the foreclosure sale — precisely the kind of harm to innocent creditors that the successor liability doctrine was designed to prevent. See *Ed Peters Jewelry Co.* v. *C & J Jewelry Co.*, 124 F.3d 252, 267 (1st Cir. 1997) (foreclosure process does not preempt successor liability inquiry).

The harm suffered by Milliken and the imposition of successor liability on New Duro go hand in hand. As the judge below

properly found, Milliken was deprived of the opportunity to wait and see whether Old Duro's business, now being conducted by New Duro, turned around financially to where it was able to repay its debt obligations. Contrary to New Duro's assertion, it was, in fact, the "debtor" by virtue of its status as the successor corporation, and therefore, it was legally responsible for the corporate liabilities incurred by Old Duro. The fact that at the time of the foreclosure sale Old Duro's debts exceeded its assets is of no consequence to Milliken's ability to recover its trade debt. Cf. *Ed Peters Jewelry Co.* v. *C & J Jewelry Co.*, *supra* at 267 (foreclosure by senior lien holder often wipes out junior lien interests in same collateral, but does not discharge debtor's underlying obligation to junior lien creditors). Absent the discharge of a debt in bankruptcy, see *Casavant* v. *Boreka*, 298 Mass. 528, 529 (1937), a judgment creditor has at least twenty years to collect payment. See G. L. c. 260, § 20. Milliken did not lose the right to recover the trade debt owed by Old Duro simply because its corporate successor, New Duro, had insufficient assets in October, 2002, to repay the debt.

(c) *Balancing of competing interests.* New Duro contends that the judge's determination on successor liability must be reversed because it threatens the dissolution of New Duro without any offsetting benefit to Milliken. As New Duro correctly points out, we have explicitly recognized that there is often a tension between public policy concerns for "the fair remuneration of corporate creditors" and "our strong interest in respecting corporate structures." *Cargill, Inc.* v. *Beaver Coal & Oil Co.*, 424 Mass. 356, 362 (1997). See *Guzman* v. *MRM/Elgin, supra* at 570-571 (recognizing "broad public policy" implications of burdening asset transfers with successor liability). Notwithstanding our respect for the integrity of corporate structures, we are troubled by the notion that by merely changing its form, without significantly changing its substance, a single corporation can wholly shed its debts to unsecured creditors, continue its business operations with an eye toward returning to profitability, and have no further obligation to pay such creditors. The application of principles of successor liability is designed to remedy this fundamental inequity as factual circumstances, such as those presented here, dictate.

New Duro further argues that holding it liable for Old Duro's debt obligations will set the stage for New Duro's likely dissolution. While such a consequence may eventually come to pass, it is mere speculation at this juncture, and there is no evidence that at the time the Ark lenders formed New Duro they were unaware of Old Duro's considerable debt. The possibility of New Duro's dissolution at some point in the future does not foreclose Milliken's successor liability claim to recover at least a portion of the money it is owed.

For the foregoing reasons, we conclude that New Duro was not entitled to summary judgment on Counts I and VII of Milliken's complaint, pertaining to successor liability.

3. *Liability under G. L. c. 93A.* Milliken contends that the defendants acted unfairly and deceptively by engineering the sale of Old Duro's assets in a manner that prejudiced its unsecured creditors, first through unsuccessful bankruptcy proceedings and then through the foreclosure sale. Milliken points out that the successor liability exception to traditional principles of corporate separateness exists to provide a remedy to creditors who would otherwise fall victim to inequitable schemes to frustrate their rights to payment. Consequently, Milliken continues, the judge's determination that a finding of successor liability does not fall within an established category of unfairness within the meaning of G. L. c. 93A was erroneous. In Milliken's view, a finding of "de facto merger" or "mere continuation" necessarily warrants a finding of liability under c. 93A with respect to the corporate owners who participated in the alleged scheme. We disagree.

General Laws c. 93A, § 11, states, in relevant part: "Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice . . . may . . . bring an action in the superior court . . . for damages and such equitable relief . . . as the court deems to be necessary and proper."[17] It is well established that "a practice or act [is] unfair under

---

[17]The terms "[t]rade" and "commerce" are defined in G. L. c. 93A, § 1 (*b*): " 'Trade' and 'commerce' shall include the advertising, the offering for sale,

G. L. c. 93A, § 2, if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Morrison* v. *Toys "R" Us, Inc.*, 441 Mass. 451, 457 (2004), quoting *Heller Fin.* v. *Insurance Co. of N. Am.*, 410 Mass. 400, 408 (1991). "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact . . . the boundaries of what may qualify for consideration as a c. 93A violation is a question of law." *Schwanbeck* v. *Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 414 (1991), *S.C.*, 412 Mass. 703 (1992).

As a threshold matter, analysis of the applicability of G. L. c. 93A, § 11, requires a dual inquiry whether there was a commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce, such that they were acting in a "business context." See *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 22-23, cert. denied, 522 U.S. 1015 (1997); *Szalla* v. *Locke*, 421 Mass. 448, 451 (1995); *Stop & Shop Supermarket Co.* v. *Loomer*, 65 Mass. App. Ct. 169, 174-175 (2005). We have stated that G. L. c. 93A "is not available to parties in a strictly private transaction, where the undertaking is not 'in the ordinary course of a trade or business.' " *Linkage Corp.* v. *Trustees of Boston Univ.*, *supra* at 23 n.33, quoting *Lantner* v. *Carson*, 374 Mass. 606, 608 (1978). Moreover, "[w]e have limited the reach of G. L. c. 93A, § 11, to exclude intra-enterprise disputes because they are more similar to purely private disputes and are not 'commercial transaction[s] . . . in the sense required by c. 93A.' " *Linkage Corp.* v. *Trustees of Boston Univ.*, *supra* at 23 n.33, quoting *Szalla* v. *Locke*, *supra* at 452. See *First Enters., Ltd.* v. *Cooper*, 425 Mass. 344, 347-348 (1997) (internal business dispute between parties in same venture not commercial marketplace transaction); *Newton* v. *Moffie*, 13 Mass. App. Ct. 462, 467 (1982) (G. L. c. 93A, § 11, intended to apply to dealings between

---

rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security as defined in [G. L. c. 110A, § 401 (*k*),] and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth."

legally separate persons engaged in arm's-length transactions). "Included in this 'intra-enterprise' classification are disputes stemming from an employment relationship, disputes between individual members of a partnership arising from partnership business, and transactions and disputes between parties to a joint venture and between fellow shareholders." *Linkage Corp.* v. *Trustees of Boston Univ., supra* at 23 n.33. See *Szalla* v. *Locke, supra* at 451, and cases cited.

When considering whether the parties were engaged in "trade or commerce" with each other such that the acts or practices complained of occurred in a "business context," we apply the test articulated in *Begelfer* v. *Najarian*, 381 Mass. 177, 190-191 (1980). See *Linkage Corp.* v. *Trustees of Boston Univ., supra* at 23; *Szalla* v. *Locke, supra* at 451-452. Application of the *Begelfer* "business context" test requires an assessment of "the nature of the transaction, the character of the parties involved, and the activities engaged in by the parties. . . . Other relevant factors are whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons . . . , and whether the participant played an active part in the transaction." *Begelfer* v. *Najarian, supra* at 191. A commercial transaction need not occur in the ordinary course of a person's trade or business before liability under G. L. c. 93A will be imposed. See *id.* However, we have held that "the mere filing of litigation does not of itself constitute 'trade or commerce.' " *First Enters., Ltd.* v. *Cooper, supra* at 347, citing *Arthur D. Little, Inc.* v. *East Cambridge Sav. Bank*, 35 Mass. App. Ct. 734, 743 (1994).

In the circumstances here, even if we were to assume that Milliken's efforts to secure the repayment of its trade debt were "commercial" in nature, Milliken and the defendants were not "engaged in trade or commerce" with each other and therefore acting in a "business context." The only dealings among these parties occurred during discussions about restructuring the debt owed to Milliken (which produced no tangible results), during the course of Old Duro's unsuccessful bankruptcy proceedings, and during the present litigation. As a legal matter, such contact did not constitute "trade" or "commerce" as defined in G. L. c. 93A, § 1 (*b*). See note 17, *supra*.

Milliken argues that absent a remedy under G. L. c. 93A for the alleged unfair or deceptive acts or practices of the defendants, no penalty will attach to their actions, and we will simply be encouraging the efforts of successor corporations to shed the debt owed by predecessor corporations to their unsecured creditors. Contrary to Milliken's assertions, however, the principles of successor liability are designed to address and remedy this precise problem.

We agree with the judge below that a determination of successor liability, in and of itself, need not be predicated on a finding of unfair or deceptive acts or practices such that the successor corporation necessarily will be subject to liability under G. L. c. 93A. By the same token, as Milliken points out, a determination of successor liability *could* result in c. 93A liability for the successor corporation. To the extent that a predecessor corporation engages in unfair or deceptive acts or practices within the meaning of c. 93A, principles of successor liability would dictate that legal responsibility for such acts should pass to the successor corporation. See *Bump* v. *Robbins*, 24 Mass. App. Ct. 296, 314-315 (1987); M.C. Gilleran, The Law of Chapter 93A § 6.11, at 244 (2007). Here, the thrust of Milliken's argument is not that Old Duro, with whom Milliken had a commercial relationship in a business context, committed unfair or deceptive acts or practices in violation of c. 93A. Rather, Milliken contends that Patriarch, the Ark lenders, Tilton, and New Duro orchestrated a comprehensive and nefarious scheme to acquire the assets of Old Duro, while shedding Old Duro's debts to unsecured creditors. These are the defendants on whom c. 93A liability theoretically could be imposed, but for the determinative fact that Milliken's "relationship" with these entities did not satisfy the criteria necessary for a viable claim under c. 93A.

For the foregoing reasons, we conclude that the defendants were entitled to summary judgment on Count VI of Milliken's complaint, pertaining to c. 93A liability.

4. *Conclusion.* The order dated June 14, 2005, granting summary judgment in favor of the defendants on Count VI of the complaint is affirmed. The final judgments entered on June 12, 2006, as amended on August 16, 2006, are affirmed.

*So ordered.*