NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

16-P-216                                          Appeals Court

ANTHONY G. MORGAN  vs.  MASSACHUSETTS HOMELAND INSURANCE
COMPANY.

No. 16-P-216.

Hampden.     November 9, 2016. - January 20, 2017.

Present:  Kafker, C.J., Kinder, & Lemire, JJ.


Consumer Protection Act, Class action, Insurance.  Practice,
     Civil, Class action, Consumer protection case.  Motor
     Vehicle, Insurance.  Insurance, Motor vehicle insurance,
     Settlement of claim, Regulation, Amount of recovery for
     loss.  Words, "Actual cash value," "Retail book value."



     Civil action commenced in the Superior Court Department on
March 8, 2012.

     Motions for class certification and for summary judgment
were heard by Edward J. McDonough, Jr., J.; and the case was
heard by Bertha D. Josephson, J.


     Brett J. Vottero (Eric D. Applebaum also present) for the
plaintiff.
     Michael S. Batson (Michael C. Kinton also present) for the
defendant.


     KAFKER, C.J.  The plaintiff, Anthony G. Morgan, brought

this civil action against the defendant, Massachusetts Homeland

Insurance Company (Homeland or insurer), alleging that Homeland engaged in unfair or deceptive claim settlement practices in violation of G. L. c. 176D, § 3(9), and G. L. c. 93A, in the course of settling his total loss auto insurance claim.[1] See G. L. c. 93A, §§ 2, 9. Even though the claim was settled within two months of the accident, with the plaintiff's acceptance of the insurer's offer, the plaintiff claimed that the insurer violated c. 176D and c. 93A because it did not take into account the "retail book value" of his vehicle, as required by 211 Code Mass. Regs. § 133.05(1)(a) (2003). The plaintiff also filed a motion to certify a class action pursuant to G. L. c. 93A, § 9(2). A judge of the Superior Court (motion judge) denied class certification and entered a summary judgment on that count of the complaint. After a jury-waived trial on the plaintiff's individual c. 93A claim, the trial judge (who was not the motion judge) found that, although Homeland had violated c. 93A, the plaintiff was not injured by the violation, and entered judgment for Homeland on that count of the complaint. On appeal, the plaintiff argues that the judges erred by (1) denying his motion for class certification; and (2) concluding that he was not

---

[1] The complaint was in three counts. The parties stipulated to the dismissal of count 1, which alleged breach of contract. Counts 2 and 3 alleged c. 93A violations -- count 2 on behalf of Morgan individually, and count 3 on behalf of a purported class of similarly situated individuals.

injured by Homeland's c. 93A violation.  Homeland cross-appeals,
challenging the trial judge's ruling that it violated c. 93A.
We conclude that the motion for class certification was properly
denied, and that there was no c. 93A violation.

Background.  On January 9, 2011, the plaintiff's 2005
Chevrolet Colorado was significantly damaged in an accident.
Homeland, the plaintiff's auto insurer, determined the vehicle
to be a total loss.  Homeland was therefore required to offer
the plaintiff an amount for the actual cash value of the
vehicle.  See 211 Code Mass. Regs. § 133.05.[2]  When calculating
the actual cash value of a total loss vehicle, an insurer must
consider four factors, one of which is the "retail book value"
of a vehicle "of like kind and quality, but for the damage
incurred."[3]  211 Code Mass. Regs. § 133.05(1)(a).

---

[2] Title 211 Code Mass. Regs. § 133.05 (2003) provides:

"(1)  Actual Cash Value.  Whenever the appraised cost of
repair plus the probable salvage value may be reasonably
expected to exceed the actual cash value of the vehicle,
the insurer shall determine the vehicle's actual cash
value."

[3] The four factors an insurer must consider in calculating
the actual cash value of a total loss vehicle are:

"(a) the retail book value for a motor vehicle of like kind
and quality, but for the damage incurred;

"(b) the price paid for the vehicle plus the value of prior
improvements to the motor vehicle at the time of the
accident, less appropriate depreciation;

On January 12, 2011, Homeland determined the actual cash value of the plaintiff's vehicle to be $11,891. Homeland used a software program generated by a third party, Certified Collateral Corporation (CCC), which maintains a database of vehicles for sale from dealers and private parties in various markets. The motion judge found that the CCC report "incorporated a significant amount of information, including, but not limited to, vehicle description, vehicle options, vehicle history, the local market, the vehicle's pre-accident condition, the value of comparable vehicles, and vehicle mileage." The record provides more particularly that CCC's database "include[s] vehicles for sale at dealerships that CCC has physically inspected and dealer and private party advertised vehicle information from more than 1,700 publications." Using the vehicle's identification number and the plaintiff's zip code, CCC compiled a list from its database of twelve comparable vehicles available for sale in the local market. Three of the vehicles were listed for sale at local dealerships that CCC had physically inspected; nine were listed for sale on Autotrader, a

---

"(c) the decrease in value of the motor vehicle resulting from prior unrelated damage which is detected by the appraiser; and

"(d) the actual cost of purchase of an available motor vehicle of like kind and quality but for the damage sustained."

211 Code Mass. Regs. § 133.05(1) (2003).

publicly accessible online database of vehicles for sale from dealers and private parties listed by age, make, model, mileage, and city and State.[4]  See, e.g., Kesling v. Hubler Nissan, Inc., 997 N.E.2d 327, 330 (Ind. 2013).  CCC then adjusted those values for the condition of the plaintiff's vehicle, and, using a weighted average formula, arrived at an actual cash value of $11,891.[5]

When informed of this valuation on January 20, 2011, the plaintiff insisted that his vehicle was worth more than $14,000, citing a report by the National Automobile Dealers Association (NADA) that showed a "clean retail" value of $14,500.[6]  NADA

---

[4] For each comparison vehicle, the CCC list also showed the distance from the plaintiff's address.

[5] The "valuation methodology" section of the CCC report reads:

"Vehicles located [by searching CCC's database] are compared to the loss vehicle, and adjustments are made for differences such as model, equipment, and odometer that results in the adjusted value for each comparable.  The comparable vehicles are used to determine the market value.

"This calculation is a weighted average that is based on the following factors:

" - Precision of the data (inspected versus advertised)
  - Similarity of model, equipment, and odometer
  - Nearness to the loss vehicle's primary garage location
  - Recency of information."

[6] The NADA report in the record provided values for "clean retail" ($14,500), "clean trade-in" ($11,325), "average trade-in" ($10,450), and "rough trade-in" ($9,375).  According to the report, "Clean Retail values reflect a vehicle in clean

maintains a publicly accessible online database of used car values in each region of the country, from which reports on particular vehicles may be generated. NADA, an industry trade association, also periodically publishes "books" containing these values in regional editions. See Braucher, Rash and Ride-Through Redux: The Terms for Holding on to Cars, Homes and Other Collateral Under the 2005 Act, 13 Am. Bankr. Inst. L. Rev. 457, 466 n.37 (2005) (Braucher). See also FTC v. CCC Holdings Inc., 605 F. Supp. 2d 26, 33 (D.D.C. 2009).

After receiving the plaintiff's c. 93A demand letter on February 11, 2011, and the NADA report, Homeland increased its valuation of the vehicle to $13,024.66, which was found by the motion judge to reflect "an average of the NADA, Auto[t]rader, and CCC valuations." Homeland subsequently increased its valuation to $13,650, which resulted in a settlement offer of $14,003.12.[7] The plaintiff accepted a check in that amount.

---

condition. This means a vehicle with no mechanical defects and passes all necessary inspections with ease. Paint, body and wheels have minor surface scratching with a high gloss finish and shine. Interior reflects minimal soiling and wear with all equipment in complete working order. Vehicle has a clean title history." "Clean trade-in" values, by contrast, reflect a vehicle that needs "minimal reconditioning to be made ready for resale."

[7] This figure included the applicable sales tax, minus the deductible. We are not called upon here to assess the correctness of this methodology.

Discussion.  1.  Class certification.  The plaintiff claims
that the judge erred in denying his motion to certify a class of
all Homeland auto insureds who received payment for a total loss
claim.  He apparently claims a class should be certified based
on Homeland's alleged use of the CCC software to determine its
original offers, which, according to the plaintiff, did not
account for the higher "retail book value," in violation of 211
Code Mass. Regs. § 133.05(1)(a).  We disagree.

To bring a class action under c. 93A, the plaintiff must
show that he seeks relief for an unfair or deceptive act or
practice, that the act or practice "caused similar injury to
numerous other persons similarly situated," and that he would
"adequately and fairly represent[]" such persons.  G. L. c. 93A,
§ 9(2), inserted by St. 1969, § 690.  The plaintiff must
"provide 'information sufficient to enable the motion judge to
form a reasonable judgment' that the class meets the relevant
requirements."  Bellermann v. Fitchburg Gas & Elec. Light Co.,
470 Mass. 43, 52 (2014), quoting from Weld v. Glaxo Wellcome
Inc., 434 Mass. 81, 87 (2001).  In deciding on a motion for
class certification under c. 93A, a judge must bear in mind the
"pressing need for an effective private remedy."[8]  Aspinall v.

_____

[8] A judge therefore has less discretion to deny class
certification under G. L. c. 93A than under Mass.R.Civ.P. 23(b),
as amended, 365 Mass. 767 (1974).  See Bellermann, 470 Mass. at

Philip Morris Cos., 442 Mass. 381, 391-392 (2004), quoting from Fletcher v. Cape Cod Gas Co., 394 Mass. 595, 605-606 (1985). We review a denial of class certification under c. 93A for an abuse of discretion. Bellermann, 470 Mass. at 51. We conclude that the motion judge did not abuse his discretion in declining to certify the plaintiff's class action, as the plaintiff failed to provide sufficient information to support a reasonable judgment that others were similarly situated and similarly injured. See id. at 54.

We begin with the specifics of the plaintiff's case. Homeland based its original offer on the CCC report, which included information from Autotrader; the insurer later made upward adjustments after considering the NADA report presented by the plaintiff. The record, however, provides little to no information regarding how other putative class members' total loss claims were calculated, negotiated, and settled. As the motion judge explained, "Morgan has failed to adduce any evidence of injury to any other party." There is also insufficient information in the record to support a reasonable judgment that Homeland employed a uniform approach in handling total loss claims. Homeland's nationwide policy provides only that CCC reports "may" be used to calculate the actual cash

_____

52; Kwaak v. Pfizer, Inc., 71 Mass. App. Ct. 293, 297-298 (2008).

value of a total loss vehicle and that "sources [such] as Auto[t]rader, NADA, Edmunds, Redbook and KBB [Kelly Blue Book]" may be consulted.  Additionally, the record does not support a reasonable judgment that reliance on the CCC software, rather than NADA or other retail book values, similarly affected other members of the putative class.  The plaintiff did not dispute that "CCC valuations are sometimes higher than other commercially available book valuations."[9]  Thus, the beneficial or detrimental effect of the use of the CCC reports in determining even the original offer would depend on each putative class member's particular circumstances.  This determination would further depend on each class member's zip code and vehicle condition, based on CCC's methodology.  Thus, there is insufficient evidence to support a reasonable judgment that the plaintiff and the putative class members were similarly situated.

Moreover, we cannot discern how the plaintiff here was actually harmed by the use of the CCC report, or how his alleged harm compared to that of the other putative class members.

---

[9] This statement appears in the parties' joint statement of material facts in support of Homeland's motion for summary judgment.  The motion judge's decisions on the motion for class certification and summary judgment were issued on the same day. Although not in the record when the judge ruled on the plaintiff's motion for class certification, we also note that one of Homeland's supervisors testified at trial that the CCC reports sometimes produce valuations higher than those from NADA.

After basing its original offer on the lower CCC number, which included Autotrader listings, Homeland did consider the NADA report in upwardly adjusting the value of the plaintiff's vehicle. The plaintiff then ultimately received a check close to the amount of his original demand, approximately $14,000. The end result was very nearly what he requested and included consideration of retail book values presented by Autotrader and NADA. Whether others were so fortunate -- or not -- is completely absent from the record.

In sum, "the facts underlying the claims of the purported class are too diverse" and the causal connection between Homeland's allegedly unfair practice and any loss "is not just difficult to identify but appears to vary widely depending on the [insured]." Kwaak v. Pfizer, Inc., 71 Mass. App. Ct. 293, 294, 301 (2008). See Bellermann, 470 Mass. at 55 (certification properly denied for class of consumers who lost power during major ice storm; outages varied for each consumer). Contrast Aspinall, 442 Mass. at 382, 392 (certification properly granted for class of consumers who purchased cigarettes allegedly falsely advertised to contain "lowered tar and nicotine"). We therefore discern no error in the motion judge's denial of the plaintiff's motion for class certification.

2. General Laws c. 93A violation. After trial, the judge concluded that Homeland had violated c. 93A because its "initial

valuation of $11,891 did not consider . . . retail book value" in determining the actual cash value of the plaintiff's vehicle, as required by 211 Code Mass. Regs. § 133.05(1)(a).[10]  See 211 Code Mass. Regs. § 133.08 (2003) ("A violation of any provision of 211 CMR 133.00 shall be considered to be an unfair or deceptive act or practice, in violation of M.G.L. c. 176D"); G. L. c. 93A, §§ 2, 9.

Homeland claims in its cross appeal that this conclusion, to the extent that it was based on a factual finding, was clearly erroneous, and incorrect as a matter of law.  We agree. It is plain from the trial record that Homeland considered retail book value information from Autotrader in formulating its initial settlement offer, and therefore the judge's finding that the initial offer violated c. 93A was incorrect.  Additionally, apart from the Autotrader information reflected in the initial offer, Homeland's final offer also incorporated retail book value from NADA, again reflecting Homeland's "consideration" of retail book value, albeit later in the settlement process.

"Whether conduct is unfair or deceptive under G. L. c. 93A is a mixed question of law and fact."  Zabin v. Picciotto, 73 Mass. App. Ct. 141, 170 (2008).  "Although whether a particular

---

[10] The judge further determined that the plaintiff was not harmed by this c. 93A violation because Homeland's March 7 offer, accepted by the plaintiff, "took into account all the relevant factors" in the regulation.

set of acts, in their factual setting, is unfair or deceptive is a question of fact . . . the boundaries of what may qualify . . . as a c. 93A violation is a question of law."  Milliken & Co. v. Duro Textiles, LLC, 451 Mass. 547, 563 (2008) (quotation omitted).  We review the judge's findings of fact for clear error and her conclusions of law de novo.  Zabin, 73 Mass. App. Ct. at 170.  Moreover, to the extent the trial judge's conclusion that Homeland violated c. 93A rested on her legal interpretation of the meaning of the requirement in 211 Code Mass. Regs. § 133.05(1) that the determination of the "actual cash value of [a] vehicle . . . shall be based on a consideration of . . . (a) the retail book value," we review that interpretation de novo.  Ivey v. Commissioner of Correction, 88 Mass. App. Ct. 18, 23 (2015).

The purpose of 211 Code Mass. Regs. § 133.00 is to "promote the public welfare and safety by establishing fair and uniform standards for the repair of damaged motor vehicles."  211 Code Mass. Regs. § 133.01 (2003).  As we have noted, the express language of 211 Code Mass. Regs. § 133.08 makes a "violation of any provision of 211 CMR 133.00 . . . an unfair or deceptive act or practice."  More generally, 940 Code Mass. Regs. § 3.16(3) (1993) provides that an act or practice that fails to comply with a regulation "meant for the protection of the public's health, safety or welfare" constitutes a violation of c. 93A if

it occurs during trade or commerce and is unfair or deceptive under the circumstances. See Klairmont v. Gainsboro Restaurant, Inc., 465 Mass. 165, 174 (2013).

As previously explained, 211 Code Mass. Regs. § 133.05(1) expressly requires an insurer calculating the actual cash value of a total loss vehicle to consider four factors, one of which is the "retail book value" of a vehicle "of like kind and quality, but for the damage incurred." 211 Code Mass. Regs. § 133.05(1)(a). The regulations do not, however, define "retail book value," nor did the trial judge attempt to do so. The parties agreed, and the judge determined without explanation, that NADA provides retail book values.[11] The trial judge also noted that Autotrader is "another commercial retail book value service" (emphasis added), which the parties did not dispute.

We begin by confirming that both the record and the case law support the judge's findings that NADA and Autotrader provide retail book values. Several courts have specifically referenced "NADA retail book value[s]." See In re Minke, 21 B.R. 214, 214 (Bankr. D. Minn. 1982); In re Stauffer, 141 B.R. 612, 612 (Bankr. N.D. Ohio 1992); McCorvey v. McCorvey, 922 So. 2d 694, 708 (La. App. 2006). Other courts have noted, generally, that NADA and/or Autotrader provide such values.

---

[11] The judge described NADA as a "retail book value service."

See, e.g., In re Morales, 387 B.R. 36, 49 (Bankr. C.D. Cal. 2008) (Autotrader); In re Ayres, Bankr. N.D. Cal., No. 09-56695 ASW, slip op. (Feb. 22, 2010) (Autotrader and NADA consulted to determine "the price a retail merchant would charge"); In re Zambuto, 437 B.R. 175, 178 (Bankr. D.N.J. 2010) (Autotrader provides "retail prices" for vehicles in excellent or "clean" condition).  See also Hylton, The Law and Economics of Products Liability, 88 Notre Dame L. Rev. 2457, 2502 n.147 (2013) (Autotrader is an "automotive retail website[]").

We therefore conclude that in the instant case retail book value was considered both in formulating Homeland's initial offer, through the inclusion of Autotrader information in the CCC comparative lists, and in the final offer, through the inclusion of NADA information.[12]  The CCC report, used by

---

[12] Because we need not resolve the issue to decide the case, we decline to determine whether the CCC methodology itself constitutes a retail book value, or, as Homeland argues, a more sophisticated retail book value than those contained in NADA, Autotrader, or other such services.  As the parties have not adequately briefed the proper interpretation of "retail book value," we are not prepared to determine whether insurers must consult so-called "'book' providers," which publish valuations online and in "books," CCC Holdings, Inc., 605 F. Supp. 2d at 33, in considering "retail book value," or whether they may arrive at retail book value through other means.  See Warcewicz v. Dept. of Envtl. Protection, 410 Mass. 548, 551 (1991) ("[N]o portion of the language of a regulation should be treated as surplusage").

One Federal District Court has differentiated "the Books" from total loss software systems such as CCC's, stating:  "Today there are several different methodologies and tools for

insurance companies to calculate total loss.  One option is the 'book' providers -- [NADA], the Kelley Blue Book, the Red Book, and the Black Book (collectively 'the Books') -- whose reports are based on local or regional values. . . .  These products are available in hard copy and many are available electronically; the electronic versions are updated more frequently than the printed Books.  A number of insurance companies perform some or even most of their total loss valuations in-house using a combination of the Books and market research conducted by internal staff in order to obtain a more accurate and localized valuation."  CCC Holdings Inc., 605 F. Supp. 2d at 33.  Although the court was addressing an unrelated issue, it further noted that "the Books" and total loss software systems are "undoubtedly differentiated products," id. at 43, and "not part of the same product market."  Id. at 41.  Specifically, the software systems have "substantially different valuation methodologies than the Books"; the Books "simply are not as accurate, detailed, or up-to-date" as the software systems.  Id. at 42.  See Braucher, 13 Am. Bankr. Inst. L. Rev. at 466 (discussing why "retail book values," including NADA, "will routinely be too high").

In Massachusetts, the Commissioner of Insurance expressed his views on the use of the CCC service in a May, 1988, letter responding to an inquiry from CCC.  In that response, the Commissioner, while cautioning that "insurer[s] may not blindly adhere to or rely solely on the dollar amount the [CCC] service generates" for the value of total loss vehicles, also indicated that he had "no objection" to the use of CCC reports as "a factor or factors in the determination of the actual cash value or 'book' value for a total loss vehicle in compliance with [211 Code Mass. Regs. § 133.05]."  Compare Pennsylvania, a State with a regulation similar to ours.  There, the regulatory agency has formally approved the use of NADA and CCC in determining the "retail book value" of a total loss vehicle.  See 31 Pa. Code § 62.3(e)(1)(i) (2016) (one method insurers may use in calculating the replacement value of a total loss vehicle is to average two values from approved "guide sources," which represents the "retail book value" of the vehicle); 46 Pa. Bull. 6734 (2016) (approving NADA, Red Book, and CCC as guide source vendors).

Homeland in arriving at its initial valuation of $11,891, explicitly took into account nine listings from Autotrader,[13] which, as we have noted, is a source that provides retail book values. Homeland's final offer undisputedly incorporated the NADA report, which included the "retail book value" of the plaintiff's vehicle.[14] In sum, the regulatory requirements involving the consideration of retail book value were satisfied in the instant case, and there was no violation of c. 93A.

Conclusion. There was no error in the denial of the motion for class certification or in the entry of judgment on that count of the complaint. Although the trial judge erred in determining that Homeland violated c. 93A, there was no error in the entry of judgment for Homeland on the plaintiff's individual claim.[15]

Order denying motion for class certification affirmed.

Judgments affirmed.

---

[13] The trial judge did not specifically address the Autotrader information in the CCC report; on the record before us, the report's content appears to be uncontested.

[14] We note, however, that insurers would be well-advised to consider the retail book value of a vehicle early in the settlement process, and not to depend on insureds to bring such information to their attention.

[15] Accordingly, the plaintiff's request for attorney's fees and costs is denied.