**Adelino VIEIRA and Monica Medeiros, on behalf of themselves and others similarly situated, Plaintiffs,**

v.

**FIRST AMERICAN TITLE INSURANCE COMPANY, Defendant.**

**Civil Action No. 08–cv–11331–DPW.**

United States District Court, D. Massachusetts.

Oct. 8, 2009.

hearing.

Elizabeth A. Ryan, John J. Roddy, Roddy, Klein and Ryan, Boston, MA, Ingrid L. Moll, William H. Narwold, Motley Rice, LLC, Hartford, CT, for Plaintiffs.

Charles A. Newman, Elizabeth T. Ferrick, Michael J. Duvall, Sonnenschein, Nath & Rosenthal, LLP, Douglas W. King, James M. Weiss, Bryan Cave, LLP, St. Louis, MO, Michael D. Vhay, DLA Piper, Rudnick, Gray, Cary, US LLP, Zachary N. Coseglia, DLA Piper US LLP, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER

DOUGLAS P. WOODLOCK, District Judge.

Plaintiffs Adelino Vieira and Monica Medeiros pursue this action on behalf of themselves and all others similarly situated against Defendant First American Title Insurance Company, alleging that First American has "routinely overcharged Massachusetts homeowners by charging premiums for title insurance far in excess of First American's established Massachusetts rates, and by failing to disclose to these customers that they are entitled to hundreds of dollars in savings when they purchase title insurance in connection with a refinance transaction." (Am. Compl. ¶ 1.) This conduct is alleged to constitute a breach of contract and to give rise to violations of MASS. GEN. LAWS ch. 93A, § 2 and the common law. First American has filed a motion (Doc. No. 15) to dismiss these claims.

## I. FACTUAL BACKGROUND

For purposes of this motion to dismiss, I must take as true all well-pleaded facts in the operative pleading (Plaintiffs' Amended Class Action Complaint) (Doc. No. 13) and draw all reasonable inferences arising therefrom in Plaintiffs' favor. *Phoung Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir.2007). I do so in the following factual recitation.

### A. First American's Rates in Massachusetts

Title insurance is an "unavoidable cost" of any mortgage refinancing. (Am. Compl. ¶ 2.) Lenders generally require title insurance in connection with a refinancing loan for a residential mortgage because title insurance protects lenders' collateral in the event of a title challenge. (*Id.*) First American's 2003 Massachusetts Rate Manual ("2003 Rate Manual") sets forth the premium rates for title insurance policies, and provides a refinancing discount that is 60% of the full rate when certain conditions are met. (*Id.* at ¶ 29.) The manual provides that "First American will grant a special refinancing premium to its insured … If the Borrower refinances within 15 years, for either the original loan amount, or less than the original loan amount the special refinancing premium charge will be 60% of the current premium based on the new loan amount." (Am. Compl., Ex. A at 4.) The rationale behind discounted refinance rates is that refinance policies involve less work for title companies and also insure against less risk than the original policy. (Am. Compl. ¶ 4.)

Plaintiffs allege that First American failed to disclose to Massachusetts homeowners that they qualified for the discounted rate when they purchased title insurance in connection with a refinance transaction, and consequently charged these customers rates in excess of First American's established rates. The overcharging and non-disclosure of discounted refinance rates in general is a "widespread practice" that has resulted in substantial profits for title insurers. (*Id.* at ¶¶ 5–6.) The discount could save a borrower hundreds of dollars in premiums. (*Id.* at ¶ 3.)

### B. Plaintiffs' Mortgage Refinancing

Plaintiffs Vieira and Medeiros, citizens of Massachusetts, purchased their home in Woburn, Massachusetts on or about August 10, 2005. (*Id.* at ¶¶ 12–13, 34.) Vieira entered into a mortgage loan with Countrywide Bank, FSB in the amount of $260,000. (*Id.* at ¶ 34.) Plaintiffs paid a total of $1,470.75 [1] to purchase title insurance issued by Defendant First American, a California corporation with a principal place of business in California (*Id.* at ¶¶ 14, 35); the total premium included both lender's coverage and owner's coverage. (*Id.* at ¶ 35.) The loan closing was handled by First American's agent, Sharaf, Kelley, and Maloney, P.C. ("SKM"). (*Id.*)

On or about March 29, 2006, Plaintiffs refinanced their home mortgage and obtained a new loan from Countrywide for $301,500. (*Id.* at ¶ 36.) Plaintiffs again used First American as their title insurer, and SKM again handled the closing. (*Id.*) As part of the refinancing, Plaintiffs paid a premium of $830.50, the full rate for lender's coverage; they were not given the discounted refinance rate. (*Id.* at ¶ 37.) Prior to paying the title insurance premium at the closing, Plaintiffs reviewed the HUD–1 form (Am. Compl., Ex. C) which included a statement of the $830.50 premium for the title insurance policy. (Am. Compl., ¶ 38.)

First American's 2003 Rate Manual allegedly contained the company's rates in effect at the time of Plaintiffs' loan transaction. (*Id.* at ¶ 28.) First American furnished its agents with state-specific guidelines; in Massachusetts, a recorded institutional mortgage in the chain of title during the prior fifteen-year period is sufficient to qualify a borrower for the discounted refinance rate. (*Id.* at ¶ 33.) Plaintiffs allege they qualified for and were entitled to receive this discount because a loan policy had been issued and their home was previously insured within fifteen years from the date of issue of their new loan policy.[2] (*Id.* at ¶ 40.) As a result, Plaintiffs contend they should have been charged a discounted refinance rate of $495.00 for title insurance. (*Id.* at ¶ 37.)

Plaintiffs claim that First American, through its agent SKM, concealed from Plaintiffs that they qualified for and were entitled to receive the discounted refinance rate, and supplied false, misleading, inaccurate, and incomplete information about the applicable rate for title insurance. (*Id.* at ¶ 39.) The non-disclosures and misinformation were material to Plaintiffs' transaction. (*Id.*) Because the refinancing was reflected in the chain of title and closing documents for Plaintiffs' and Class members' properties, First American knew or should have known that Plaintiffs and Class members qualified for, and were entitled to receive, a discounted refinance rate; particularly in Plaintiffs' case where First American had issued their prior loan policy. (*Id.* at ¶ 42.) First American consequently caused Plaintiffs financial harm by overcharging them for this premium when they were entitled to receive the discounted refinance rate. (*Id.* at ¶ 43.)

---

1. The HUD–1 Settlement Statement, attached to the Amended Complaint as Exhibit B, states that Plaintiffs paid $1,470.75 for title insurance. At the motion hearing on this matter, Plaintiffs' counsel conceded that paragraph 35 of the Amended Complaint is in error and the correct figure appears in Exhibit B.

2. Similarly, all putative Class members are said to have entered into comparable transactions in which they qualified for and were entitled to receive a discounted refinance rate because their homes had been insured previously within fifteen years from the date of issue of their new loan policies. (Am. Compl. ¶ 41.)

## C. *Litigation History*

On August 5, 2008, Plaintiffs sent a demand for relief, pursuant to MASS. GEN. LAWS ch. 93A, to First American on behalf of themselves and a class of others similarly situated, seeking relief for First American's unfair and deceptive practices. (*Id.* at ¶ 44; Ex. D.) First American received the demand on August 8, 2008 and had thirty days to respond; but First American never responded or offered any relief. (*Id.* at ¶ 45.)

The operative pleading, the Amended Class Action Complaint,[3] was filed by the Plaintiffs to recover for harm caused by First American's "pattern of deceptive acts and practices," and asserts claims for breach of contract, unjust enrichment, money had and received, and a violation of MASS. GEN. LAWS ch. 93A. (*Id.* at ¶ 15.)[4] Plaintiffs allege that, from August 5, 2002 to the present, First American engaged in deceptive acts and practices and defrauded Plaintiffs and Class members by overcharging for premiums and/or by failing to disclose their entitlement to discounted premiums. (*Id.* at ¶ 16.) Plaintiffs and Class members seek, *inter alia,* damages for the difference between the amount of the title insurance premiums charged by First American *without* the discounted refinance rate and the amount of the title insurance premiums had the discount rightfully been applied. (*Id.* at ¶ 48.)

On October 20, 2008, First American filed the instant Motion (Doc. No. 15) to Dismiss Plaintiffs' Amended Complaint with prejudice for failure to state a claim under Fed.R.Civ.P. 12(b)(6), as well as for failure to plead a fraud claim with particularity under Fed.R.Civ.P. 9(b).[5]

## II. STANDARD FOR MOTION TO DISMISS

Under the Federal Rules of Civil Procedure, a complaint must contain a "short plain statement of the claim showing that the pleader is entitled to relief...." FED. R. CIV. P. 8(a)(2). To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, the complaint must nevertheless allege "a plausible entitlement to relief," *FitzGerald v. Harris,* 549 F.3d 46, 52 (1st Cir.2008) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 559, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)), and contain factual allegations sufficient "to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal citations omitted).

The court considering the merits of a motion to dismiss "may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint and matters of which judicial notice can be taken." *Declude, Inc. v. Perry,* 593 F.Supp.2d 290, 294 (D.Mass.2008). The court must take all factual allegations in the complaint as true and draw all reasonable inferences arising therefrom in the plaintiff's favor. *Phoung Luc,* 496 F.3d at 88. The allega-

---

**3.** Plaintiffs filed the original Class Action Complaint (Doc. No. 1) on August 4, 2008.

**4.** The putative Class is comprised of "persons who, at any time from August 5, 2002 to the present (the 'Class Period') refinanced mortgages on residential property in Massachusetts and paid an amount more than the refinance rate for a lender's title insurance policy issued by First American during the class period but qualified for the refinance rate because they had a prior insured mortgage within the previous *fifteen* years (the 'Class')." (*Id.* at ¶ 17 (emphasis in original).)

**5.** I need not analyze whether the Plaintiffs have complied with Rule 9(b) because, as discussed below, I find they failed to meet the pleading standard under Rule 12(b)(6).

tions, however, must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.

## III. DISCUSSION

### A. *Title Insurance in Massachusetts*

Title insurance premiums and rates are not regulated in Massachusetts. Certain types of insurance companies have state-regulated rates as designated by statute, but unlike the statutory regime for incorporating insurance companies, the statutory designation for rates omits title insurance companies from the list of insurance providers which the legislature regulates. *Compare* MASS. GEN. LAWS ch. 175 § 47, cl. 11 (permitting the incorporation of title insurance companies) *with id.* at ch. 175A § 4 (regulating rates for certain types of insurance but omitting title insurance).

In contrast, other states—including Texas, Connecticut, Idaho, and Ohio—fix mandatory premium rates for title insurers, including the mandatory discounted refinance rate. *See, e.g., Mims v. Stewart Title Guaranty Co.*, 521 F.Supp.2d 568, 570 (N.D.Tex.2007) ("The Texas Department of Insurance ("TDI") fixes the premium rates to be charged by title insurance companies. . . . TDI has also adopted mandatory rates for reissue lender title policies, and these rates are calculated . . . [with] the 'reissue discount.' "); *Lentini v. Fidelity Nat'l Title Ins. Co. of N.Y.*, 479 F.Supp.2d 292, 300 (D.Conn.2007) ("In Connecticut, the state has established a statutory framework to regulate title insurance rates."); *Lewis v. First Am. Title Ins. Co.*, No. 06–CV–00478–S–EJL, 2007 WL 2815041, at *4 (D.Idaho Sept. 25, 2007) ("The applicable reissue premium for the purchase price of the title insurance has been identified by state law as the same as the premium set forth in the rate sched-

ules."); *Barnes v. First Am. Title Ins. Co.*, No. 1:06CV574, 2006 WL 2265553, at *1 (N.D.Ohio Aug. 8, 2006) ("Pursuant to Ohio [statute], every insurer must file with the Ohio Superintendent of Insurance its rates . . . [T]he Ohio Title Insurance Rating Bureau ("OTIRB") [sic] . . . is licensed by the Ohio Department of Insurance to file a rate manual. The rate manual is binding upon all members of the OTIRB and contains the insurer's rates. The discount rate is available if the customer meets certain criteria. . . .").

### B. *Breach of Contract (Count I)*

 Under Massachusetts law, "[i]t is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 430 Mass. 875, 724 N.E.2d 699, 703 (2000). As part of contract formation, "[t]he parties must give their mutual assent by having 'a meeting of the minds' on the same proposition on the same terms at the same time." *I & R Mech., Inc. v. Hazelton Mfg. Co.*, 62 Mass. App.Ct. 452, 817 N.E.2d 799, 802 (2004); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 17 comment c (1981) ("The element of agreement is sometimes referred to as a 'meeting of the minds.' ").

 In order to plead a viable breach of contract claim under Massachusetts law, "plaintiffs must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiffs sustained damages as a result of the breach." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007). It is not enough to allege, in a conclusory fashion, that the facts demonstrate a breach of contract. *Id.* Rather it

is "essential to state with 'substantial certainty' the facts showing the existence of the contract and legal effect thereof." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194–95 (1st Cir.1996) (affirming dismissal of breach of contract claim where the complaint neither explained what obligations the alleged contract imposed on each of the parties, nor presented "the terms of a contract, its duration, or even when it was formed"). The pleading therefore must explain what obligations the alleged contract imposed on each of the parties to avoid dismissal under Rule 12(b)(6). *Id.* at 195.

### 1. The Contract

■ From the face of the Amended Complaint, it is unclear what contract First American is alleged to have breached. The Amended Complaint states that Plaintiffs and Class members entered into a contract with First American in which they paid a premium to First American in exchange for a lender's policy of title insurance for their mortgage refinancing. (Am. Compl. ¶¶ 51–52.) In opposing First American's Motion to Dismiss, Plaintiffs contend that two contracts can be inferred from the facts in the Amended Complaint: first, an express contract in the form of First American's title insurance policy issued to Plaintiffs' lender, and second, an implied contract between Plaintiffs and First American.

The Plaintiffs appear to contend that pursuant to the express contract, as with the implied contract, First American agreed to issue a title insurance policy to Plaintiffs' lender, in consideration for Plaintiffs' payment of the title insurance premium at the loan closing. The express contract, to which Plaintiffs agreed, however, contains the rate to which they object. Plaintiffs contend that "[b]y issuing such a policy, First American implicitly assented

to the terms of the implied contract, which implicitly provided that the title insurance premium would be in accordance with First American's rate manual." This inference is no doubt plausible in similar cases arising in states—for example, Idaho and Ohio—that have mandatory statutory or regulatory schemes that bind title insurers to specific published rates. *See, e.g., Lewis*, 2007 WL 2815041, at *4 (permitting claim for breach of implied contract where the applicable reissue premium was "identified by state law as the same as the premium set forth in the rate schedules"); *Randleman v. Fidelity Nat'l Title Ins. Co.*, 465 F.Supp.2d 812, 819 (N.D.Ohio 2006) (denying motion to dismiss breach of contract claim where implied contract "implicitly provided that the cost of the insurance rate would be lawful (i.e., in conformity with the rate schedule)" filed with the Ohio Department of Insurance). But, the reasoning in those cases, arising in circumstances where the title companies allegedly breached an implied contract by charging more than permitted by the *statutory rate schedules*, is inapplicable here. Massachusetts, in contrast, does not bind title insurers to certain rates or discounts. *See* Section III.A, *supra.*

Plaintiffs' breach of contract claim lacks the necessary statutory or regulatory foundation for incorporating the 2003 Rate Manual as a term in their alleged implied contract; consequently there was no breach of an implied contract because no implication is supportable. The express terms of the title insurance policy, of course, repudiate the implied term the Plaintiffs seek to import into the agreement. There is, in short, no breach of the express terms of the contract

### 2. Meeting of the Minds

■ Moreover, even if I accept as true Plaintiffs' allegation that the contract "in-

cluded, without limitation, First American's obligation to charge a premium in accordance with the 2003 Massachusetts Rate Manual," (Am. Compl. ¶ 53), Plaintiffs fail to plead any facts—much less with "substantial certainty"—that there was mutual assent such that this obligation and the 2003 Rate Manual became terms of the contract. *See Doyle,* 103 F.3d at 194. This omission undermines Plaintiffs' breach of contract claim regardless of whether the contract is express or implied.

In fact, Plaintiffs' contradictory alternative allegations underscore the difficulties inherent in their breach of contract claim under either an express or implied theory. On one hand, Plaintiffs claim that they were unaware of the discounted refinance rates to which they were entitled. (Am. Compl. ¶ 47.) On the other hand, Plaintiffs allege that a contract term obligated First American to charge them the discounted refinance rate in the 2003 Rate Manual (*Id.* at ¶ 53), and that First American breached that term by failing to inform Plaintiffs that they qualified for these discounted rates and thus overcharging them. (*Id.* at ¶ 56.) But if Plaintiffs were unaware that the discounted refinance rates applied to their transaction, then there could not be a "meeting of the minds" with respect to a contract term requiring First American to charge the discounts. Put simply, Plaintiffs could not agree to a contract term obligating First American to provide a discount if Plaintiffs did not even know such a discount existed at the time they entered into the contract. Plaintiffs have not alleged with "substantial certainty" facts showing the existence of a binding contract that included the

term that First American allegedly breached. *See Doyle,* 103 F.3d at 194–95.

### C. Violation of Mass. Gen. Laws ch. 93A (Count IV)

Plaintiffs alternatively claim that First American violated MASS. GEN. LAWS ch. 93A, § 2 by engaging in unfair or deceptive practices. This statute proscribes "unfair or deceptive acts or practices in the conduct of any trade or commerce." [6] *Id.* at § 2(a). To prove a claim under Chapter 93A, § 2, "it is neither necessary nor sufficient that a particular act or practice violate common or statutory law." *Mass. Eye & Ear Infirmary v. QLT Phototherap., Inc.,* 552 F.3d 47, 69 (1st Cir.2009) (*citing Kattar v. Demoulas,* 433 Mass. 1, 739 N.E.2d 246, 257 (2000)). Rather, courts evaluate unfair and deceptive trade practice claims under Chapter 93A on a case-by-case basis. *Id.* "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact ... the boundaries of what may qualify for consideration as a c. 93A violation is a question of law." *Milliken & Co. v. Duro Textiles, LLC,* 451 Mass. 547, 887 N.E.2d 244, 259 (2008) (*quoting Schwanbeck v. Federal–Mogul Corp.,* 31 Mass. App.Ct. 390, 578 N.E.2d 789, 803 (1991), *rev'd,* 412 Mass. 703, 592 N.E.2d 1289 (1992)). Regulations promulgated by the Attorney General may offer guidance as to whether an act or practice violates Chapter 93A. *See* MASS. GEN. LAWS ch. 93A, § 2(c) ("The attorney general may make rules and regulations interpreting the provisions of subsection 2(a) of this chapter.").[7]

---

**6.** The Amended Complaint alleges that First American has acted in the conduct of trade or commerce as defined in MASS. GEN. LAWS ch. 93A, § 1 (Am. Compl. at ¶ 69), and that this conduct is part of a general business practice that constitutes unfair and deceptive acts in

violation of MASS. GEN. LAWS ch. 93A, § 2. (*Id.* at ¶¶ 75–77.)

**7.** Plaintiffs allege that First American's practices violate regulations issued pursuant to chapter 93A, including but not limited to 940

The Amended Complaint alleges that First American owed a duty to disclose the correct applicable rates for title insurance—which is "material information"—in a refinancing transaction. (Am. Compl. ¶ 70.) First American's duty of disclosure is said to arise from the following facts: First American (1) affirmatively revealed only a higher price, i.e., the regular rate; (2) knew that Plaintiffs were paying the regular non-discounted rate based on Plaintiffs' "mistaken knowledge;" and (3) had superior knowledge of the correct rate. (*Id.* at ¶¶ 71–73.)[8]

#### 1. *Legal Obligation of Disclosure*

■ Plaintiffs cite factually analogous cases in other jurisdictions where the title insurers' practices of nondisclosure of available lower rates were found to be unfair or deceptive. *See, e.g., Woodard v. Fidelity Nat'l Title Ins. Co.*, No. CIV 06–1170–RB/WDS, 2007 WL 5173415, at *6 (D.N.M. Dec. 4, 2007) (finding plaintiff stated a claim for relief under New Mexico unfair trade practices statute where title insurer " 'uniformly misrepresented to plaintiff ... the *legally allowable price* of

its policy premiums' during the refinancing transaction") (emphasis added); *Cohen v. Chicago Title Ins. Co.*, No. 06–873, 2006 WL 1582320, at *1, *3 (E.D.Pa. June 5, 2006) (holding plaintiff "adequately pled deception" under Pennsylvania's unfair trade practices statute where "[t]itle insurance in Pennsylvania is pervasively regulated by [statute]" and plaintiff was charged in excess of the state-approved discounted refinance rate). These cases are distinguishable because, unlike Massachusetts, the state regulatory regime require title insurers to charge state-regulated rates, and by failing to disclose and/or misrepresenting those rates, the title insurers could be held thereby to have engaged in deceptive or unfair practices. *Cf. Leslie v. Fidelity Nat'l Title Ins. Co.*, 598 F.Supp.2d 1176, 1181–82 (W.D.Wash.2009), *modifying* No. C08–5252BHS, 2008 WL 5000275 (W.D.Wash. Nov. 21, 2008) (concluding that "the fact that a title insurer deviates from filed rates does not give rise to a per se claim under the [Consumer Protection Act] unless a plaintiff can establish that the insurer acted in bad faith" because "[a]t a minimum, *had the Legisla-*

---

MASS. CODE REGS. §§ 3.04, 3.05, and 3.16. (Am. Compl. ¶ 76.) In general, under § 3.16 an act or practice violates Chapter 93A if: (1) it is "oppressive or otherwise unconscionable in any respect;" (2) it involves a failure to disclose to a buyer "any fact, the disclosure of which may have influenced the buyer ... not to enter into the transaction;" (3) it fails to comply with existing statutes, rules, regulations or laws meant to protect the public's health, safety, or welfare; or (4) it violates federal consumer protection statutes within the purview of chapter 93A, § 2. 940 MASS. CODE. REGS. § 3.16.

More specifically, the regulations prohibit deceptive pricing and general misrepresentations about products. *See id.* at § 3.04 (prohibiting a claim or representation "made by any means which has the capacity or tendency or effect of deceiving buyers or prospective buyers as to the value or ... price of a prod-

uct, or as to any reduction in price of a product, or any saving relating to a product"); *id.* at § 3.05(1) (prohibiting a claim or representation "made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect"); *id.* at § 3.05(2) (prohibiting misleading advertisements).

8. Additionally, Plaintiffs allege that First American "wrongfully misrepresent[ed] the applicable rate for title insurance by failing to inform customers who qualify for refinance rates that they qualify for such rates." (Am. Compl. ¶ 74.) This misrepresentation allegation essentially restates the nondisclosure allegation because Plaintiffs have not pointed to an affirmative misrepresentation made by First American or SKM.

*ture intended a deviation from filed rates to constitute a per se violation of the CPA, it would have included affirmative language prohibiting the deviation from filed rates"*) (emphasis added).

■ That Massachusetts law does not impose mandatory rates on title insurers does not automatically preclude a finding that First American violated Chapter 93A by nondisclosure. *See Mass. Eye & Ear Infirmary,* 552 F.3d at 69. An antecedent issue is whether First American had a legal obligation either to inform Plaintiffs of its discounted refinance rate or to provide that rate. Plaintiffs have belatedly advanced in briefing the proposition that First American must honor its advertised discounted refinance rate and online rate calculator price quotes in compliance with chapter 176D; accordingly, they contend, First American has an obligation to charge the rates it advertised. *See* MASS. GEN. LAWS ch. 176D, § 3 (defining unfair methods of competition and unfair or deceptive acts or practices in the business of insurance.) While this allegation, and the exhibits attached to the Sur–Reply, might be well founded, they appear neither in the Amended Complaint nor its exhibits, and therefore fall outside the purview of a motion to dismiss. *Declude,* 593 F.Supp.2d at 294.

Moreover, even if treated as within the pleadings, the web advertizing undermines Plaintiffs' theory of this case and hence any effort to amend the complaint to include would be rejected as futile. The web site expressly provides: *"To qualify for a premium discount rate: At the time of the application, Insurer must be presented* with either: (a) a copy of an existing owner's policy of title insurance, which insures the present owner, or (b) the current lender's title policy, which insures the present loan on the property." (Sur–Reply, Ex. A) (emphasis added).

Because Plaintiffs concede they, in fact, did not comply with these prerequisites to obtaining the discounted rate, those facts cannot properly be pled in the Amended Complaint. The allegation that the refinancings were reflected in the chain of title and closing documents does not equate to a presentment of these documents to the insurer at the time of the application. (Am. Compl. ¶ 42.) The fact of conditional eligibility, which appears on First American's website, plainly contradicts the allegation that First American had any legal obligation to disclose the discount because the advertized discount is not mandatory but depends upon predicate actions undertaken by those seeking title insurance from First American.

### 2. General Principles of Unfairness and Deception

■ Nor do the circumstances of Plaintiffs' case fall within the general principles of unfairness or deception. A "deceptive" act or practice under chapter 93A is one that "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted." *Brennan v. Carvel Corp.,* 929 F.2d 801, 812 (1st Cir.1991) (*quoting Lowell Gas Co. v. Att'y Gen.,* 377 Mass. 37, 385 N.E.2d 240, 249 (1979)). An act or practice is "unfair" within the meaning of the statute "if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." *Milliken,* 887 N.E.2d at 259 (*quoting Morrison v. Toys "R" Us, Inc.,* 441 Mass. 451, 806 N.E.2d 388, 392 (2004)).

#### a) Deception

■ I find that Plaintiffs have failed to allege deception by First American as de-

fined by chapter 93A. "A violation of the statute requires a 'material, knowing, and wilful nondisclosure.'" *Mayer v. Cohen–Miles Ins. Agency, Inc.,* 48 Mass.App.Ct. 435, 722 N.E.2d 27, 33 (2000) (discussing the interplay between 940 MASS.CODE REGS. § 3.16(2) and ch. 93A); *see also* 940 MASS.CODE REGS. 3.16(2) ("An act or practice is a violation of M.G.L. c. 93A, § 2 if ... [a]ny person or other legal entity ... fails to disclose to a buyer ... any fact, the disclosure of which may have influenced the buyer ... not to enter into the transaction...."). Plaintiffs do not explain how First American's failure to inform them of the discounted refinance rate was "material, knowing, and wilful." There is no allegation that, without the discounted refinance rate, Plaintiffs would have acted differently, either in the broader context by not refinancing their mortgage, (*see* Am. Compl. ¶ 36 (defining as "the Transaction" Plaintiffs' mortgage refinancing, not the issuance of title insurance)), or, more narrowly, by declining to obtain title insurance from First American. *See Brennan,* 929 F.2d at 812. Indeed, that Plaintiffs actually refinanced their loan at the disclosed rate establishes that the rate charged was not material. What they seek is a belated rebate from the rate to which they actually agreed.

In support of its argument that First American's acts were deceptive, Plaintiffs have submitted *Campbell v. First American Title Insurance Co.,* 644 F.Supp.2d 126 (D.Me.2009) as supplemental authority. (Doc. No. 30.) The *Campbell* court found sufficient facts in the complaint to support the conclusion that First American "knew or should have known that the Campbells and Class members qualified for, and were entitled to receive, a discounted refinance rate." *Campbell,* 644 F.Supp.2d at 135. Like other jurisdictions faced with the same factual premise, *Campbell* held that "an insurer's failure to disclose or to charge a discounted rate, when that insurer has reason to know that the borrower is eligible for such rate, may be unfair or deceptive." *Id.* However, in each of these cases, and in *Campbell* itself, state law requires title insurers to adhere to mandatory premium rates that are filed and approved by the state. *Id.* at 128–29, 135 (citing title insurance cases from Ohio and Idaho).

In the instant case, while the Amended Complaint contains the identical allegation that "First American knew or should have known that Plaintiffs ... qualified for, and were entitled to receive, a discounted refinance rate" (Am. Compl. ¶ 42), I do not find this "knowledge" allegation meaningful. Plaintiffs do not allege *how* First American's own knowledge regarding applicable rates is material to the Plaintiffs where the discounted rates are neither mandatory nor a term in the title insurance policies. I therefore find, on this basis, that First American's alleged failure to disclose the discounted rate is not deceptive within the meaning of Chapter 93A.

### b) *Unfairness*

■ Similarly, I find that the pleadings do not support a claim that First American engaged in unfair acts or practices. Prior to paying the standard premium at the closing, Plaintiffs had an opportunity to review the HUD–1 form, which included the *standard* premium for the title insurance policy. After that review, they agreed to pay that price. (Am. Compl. ¶ 38.) That Plaintiffs did not receive a discount for which they *may* be eligible is not unfair where there is no automatic, mandatory entitlement to such discount in connection with a refinancing. Charging Plaintiffs' the usual price of title insurance is not "oppressive or otherwise unconscionable" in violation of 940 MASS.CODE REGS.

§ 3.16(1), where Plaintiffs cannot show that rate was necessarily an overcharge.

### 3. Conclusion

To read Chapter 93A to import a pricing obligation and correlative regulation, which the state legislature plainly declined to include for title insurance in Chapter 175A § 4, would improperly permit a general statutory enactment (Chapter 93A) that evidences no specific concern with title insurance to displace a fully reticulated statutory scheme for insurance regulation. *See Harry C. Crooker & Sons, Inc. v. Occupational Safety & Health Review Comm'n*, 537 F.3d 79, 84 (1st Cir.2008) ("It is a conventional canon of legal interpretation that specific provisions trump more general ones."); *Edmond v. U.S.*, 520 U.S. 651, 657, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs."); *Silva v. Rent–A–Center, Inc.*, 454 Mass. 667, 912 N.E.2d 945, 949 (2009) (remaining "mindful of the established canon of statutory construction that 'general statutory language must yield to that which is more specific.' ")

To be sure, Chapter 93A may provide an independent grounds to govern pricing when a business entity is required to adhere to some broadly defined regulatory obligation. *Cf. In Re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 183–91 (1st Cir.2009) (finding Chapter 93A violation for manipulation of pharmaceutical companies' obligation to seek Medicare reimbursement for "average wholesale price"). But there is no such regulatory obligation here which could be supplemented by Chapter 93A. In effect, Plaintiffs are seeking to create a rule of law that would obligate those who offer any goods or services to apply the "best" price found in its pricing policies to every customer, even if a customer had not been made aware of the "best" price and had not asked for it. If Chapter 93A is to be read to impose such an obligation, the Legislature, and not the courts acting case by case, must at a minimum make express an intention to embrace such a capacious regulation of prices in Massachusetts trade or commerce. Nothing in the particular circumstance of this dispute supports a finding that First American's practices here were either deceptive or unfair within the meaning of Chapter 93A.[9]

### D. Unjust Enrichment (Count II)

In order to state a claim for unjust enrichment under Massachusetts law, Plaintiffs must prove: (1) a benefit conferred upon First American by Plaintiffs; (2) an appreciation or knowledge of the benefit by First American; and (3) the acceptance or retention of the benefit by First American under circumstances which make such acceptance or retention inequitable. *Stevens v. Thacker*, 550 F.Supp.2d 161, 165 (D.Mass.2008) (*citing* 12 WILLISTON ON CONTRACTS § 1479). The Amended Complaint asserts that First American has benefitted by unjustly charging, collecting and retaining title insurance premiums in excess of the discounted refinance rates (Am. Compl. ¶¶ 59–60); as a direct and proximate result, Plaintiffs are said to have suffered damages. (*Id.* at ¶ 61.)

First American seeks dismissal of Plaintiffs' unjust enrichment claim because there is an express contract-the title insurance policy-covering the same subject matter. *Cf. Zarum v. Brass Mill Materials Corp.*, 334 Mass. 81, 134 N.E.2d 141, 143 (1956) (finding no basis for *recovery* under

---

**9.** Nor do the open textured regulations of the Attorney General under Chapter 93A, *see* Note 6 *supra*, support a finding of unfair and deceptive practices in the particular circumstances of this dispute.

unjust enrichment where, after a bench trial, the court found there was an existing express contract covering the same subject matter) (emphasis added). Yet First American overlooks Fed.R.Civ.P. 8(d), which permits Plaintiffs to plead alternative and even inconsistent legal theories, such as breach of contract and unjust enrichment, even if Plaintiffs only can recover under one of these theories. *Limone v. U.S.*, 579 F.3d 79, 93 (1st Cir.2009) ("The plaintiffs had the right to plead alternative theories of liability, *see* Fed.R.Civ.P. 8(d), and their exercise of that right did not debar them from an independent review of each set of claims."); *see also Barrett v. H & R Block, Inc.*, 652 F.Supp.2d 104, 112 (D.Mass.2009) (denying motion to dismiss because "Rule 8 permits plaintiffs to plead alternative theories of liability" even when plaintiffs may only recover under one of these theories); *Zamzam Telecard, Inc. v. New Jersey's Best Phonecards*, 514 F.Supp.2d 136, 139 (D.Mass.2007) (denying motion to dismiss unjust enrichment claim even where pleading contained a breach of contract claim).

Nevertheless, I find Plaintiffs have failed to state a claim under their alternative theory of unjust enrichment. Plaintiffs have failed to plead adequately that they were entitled to the discounted refinance rate in the 2003 Rate Manual, and without demonstrating that the rates therein necessarily applied to their transaction, Plaintiffs cannot prove that First American was unjustly enriched at their expense. *Cf. Mims*, 521 F.Supp.2d at 574 (finding plaintiffs stated a claim for unjust enrichment where "Plaintiffs allege that they were entitled to the mandatory discount and that [title insurer], by failing to give it to them, wrongfully and/or passively received a benefit which would be unconscionable for it to retain"). Especially given the lack of a viable Chapter 93A claim, *see* Section III. C *supra*, there is no

entitlement to such a discount demonstrated in the pleadings here.

### E. Money Had and Received (Count III)

█ Under Massachusetts law, a claim for money had and received "lies to recover money which should not in justice be retained by the defendant, and which in equity and good conscience should be paid to the plaintiff." *Cannon v. Cannon*, 69 Mass.App.Ct. 414, 868 N.E.2d 636, 643–44 (2007); *see Frontier Management Co. v. Balboa Ins. Co.*, 658 F.Supp. 987, 993 (D.Mass.1986) ("An action for moneys had and received is not ... an action on the contract. It is an equity action aimed at restoring wrongfully obtained moneys to the rightful owner, regardless of how that money was obtained or what the basis of the rightful owner's claim might be.").

█ The Amended Complaint pleads as follows with respect to this count. First American wrongfully charged Plaintiffs monies in excess of the discounted refinance rates. (Am. Compl. ¶ 63.) As a result, Plaintiffs paid the monies to First American inadvertently and by mistake, and had no moral or legal obligation to make this payment. (*Id.* at ¶ 64.) First American therefore is said to be wrongfully in possession of the monies it has no right to retain, and Plaintiffs are entitled to the return of the monies under principles of equity and good conscience. (*Id.* at ¶¶ 65–67.)

First American seeks dismissal of this claim on the basis that an equitable cause of action cannot rewrite an express contract term. Again, while Rule 8(d) permits Plaintiffs to plead alternative and inconsistent claims even if recovery under both theories is ultimately barred, I find that the Amended Complaint fails to allege facts which, if true, would support the

claim for money had and received for the same reasons that the unjust enrichment claim fails. By insufficiently pleading First American's obligation to charge-or correspondingly Plaintiffs' entitlement to-the discounted refinance rate in Plaintiffs' transaction, Plaintiffs cannot show that First American wrongfully overcharged Plaintiffs and therefore is wrongfully in possession of Plaintiffs' monies. *Cf. Mims,* 521 F.Supp.2d at 574 ("Plaintiffs' allegation that [title insurer] failed to apply the mandatory discount for its reissue policy states a claim for money had an received....").

## IV. CONCLUSION

For the reasons set forth more fully above, I GRANT First American's motion to dismiss (Doc. No. 15).